AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

United States Courts
Southern District of Texas
FILED

*May 31, 2023*

Nathan Ochsner, Clerk of Court

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) |
| One (1) black iPhone 7 cellular phone with IMEI #359162074437018 | |

Case No.   **4:23-mj-1148**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

located in the ___Southern___ District of ___Texas___, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment A and B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. 1956(a)(1) | Laundering of Monetary Instruments |
| Title 15 U.S.C. 1 & 2 | Conspiracy to Fix Prices & Monopolize |
| Title 18 U.S.C. 1951(a) | Interference with Commerce by Extortion |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Garrett Corley, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___by telephone___ *(specify reliable electronic means)*.

Date: ___May 31, 2023___

*Judge's signature*

City and state: ___Houston, TX___

Sam S. Sheldon, United States Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH | § | |
| OF ONE (1) BLACK IPHONE | § | CASE No. |
| CELLULAR PHONE WITH IMEI | § | |
| #359162074437018 | § | **4:23-mj-1148** |
| | § | |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION

I, Garrett Corley, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search one (1) black iPhone 7 cellular phone with IMEI #359162074437018 seized from 1011 Travis Steet, Mission, Texas 78572 (hereinafter, "1011 Travis St"), a residence owned by Carlos Favian MARTINEZ-Perez (hereinafter "MARTINEZ").

2.      I am a Special Agent with HSI and have been since June 2015.   I received twenty-four (24) weeks of criminal investigator training including fraudulent document investigations and related legal matters at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.   As a Special Agent for HSI, I have conducted investigations which have involved criminal enterprises and their elements of financiers, manufacturers, distributors, and money launderers.   I have conducted and/or participated in a variety of operations.   I am a member of the Financial Crimes Unit.   Prior to my current assignment with HSI, I was an Intelligence Research Specialist for HSI from March 2013 to June 2015.   Prior to that, I was a Research Specialist with the Texas Department of Public Safety from May 2011 to March 2013.   Prior to that, I served in the United States Army from 2004 to 2010.   During my ongoing law enforcement career, May 2011 to the present, I have researched and investigated violations the United States Code (U.S.C.), particularly Titles 8, 18, 19, and 21.   In addition, I have researched and developed a working knowledge of Title 15 violations and have discussed these violations

with more knowledgeable agents and prosecutors.  I obtained a Bachelor of Business

Administration in Management Information Systems from the University of Saint Thomas in

2003.  I obtained an associate degree in Korean from the Defense Language Institute in 2006.

3.      As a Special Agent with HSI, I have had training in the investigation of organized

crime, drug smuggling and violations of the Controlled Substances Act, the Controlled

Substances Import/Export Act, the Money Laundering Control Act, the Bank Secrecy Act, and

the Immigration and Naturalization Act.  I have participated in investigations conducted by other

agents and officers from other federal, state, and local agencies concerning controlled

substances, the laundering of illicit proceeds, and the illegal smuggling, transportation, and

housing of illegal aliens.  I am cross designated by the Drug Enforcement Administration (DEA),

and I am authorized by the Administrator of the DEA to conduct independent investigations of

violations of Title 21 U.S.C.  I am currently assigned to the Financial Crimes Unit and have

personally conducted and participated in financial investigations in which the criminal proceeds

were derived from illegal activity.  I have also participated in numerous investigations involving

money laundering in violation of Title 18, U.S.C., Sections 1956 and 1957.  In my experience,

members of criminal organizations sometimes obtain cellular telephones in fictitious names

and/or the names of third parties to conceal their identity when conducting illegal activities.

Individuals involved in criminal activity oftentimes utilize multiple cellular telephone features

including, but not limited to, phone calls, push to talk (PTT), text messaging, and encrypted

messaging applications to communicate with each other to facilitate their criminal conduct.

Through my training and experience, I know that leaders, organizers and participants in criminal

organizations often keep logs, or ledgers to keep track of debts paid and owed by other members

of the criminal organization. Often these records are kept in paper and digital formats that are stored on cellular telephones and other electronic devices.

4.     Based upon my training, experience, and participation in investigations involving violations of multiple criminalities, including money laundering, I know that:

a.   Members of an extortion or money laundering conspiracy often use cellular telephones to communicate, negotiate and coordinate illicit transactions with associates in relation to criminal activities;

b.   Members of an extortion or money laundering conspiracy often use cellular telephone capabilities to photograph criminal evidence with the intention of sending photographs or other digital documents as attachments in text messaging or via electronic mail (email) from their cellular telephones to prove possession of contraband, currency or the completion of a transaction to associates;

c.   Members of an extortion or money laundering conspiracy commonly store phone numbers, direct connect numbers, electronic mail addresses, names and identities of associates in their cellular telephones;

d.   Members of an extortion or money laundering conspiracy commonly store photographs, text messages, electronic mail messages and other digital files or information in their cellular telephone's memory in relation to violations of federal criminal statutes, including, Title 15 U.S.C. § 1 – Conspiracy to fix prices and allocate the market, Title 15 U.S.C. § 2 – Conspiracy to monopolize, Title 18 U.S.C. § 1956(a)(1) -Laundering of Monetary Instruments, Title 18 U.S.C. § 1956(h) - Conspiracy to Launder Monetary Instruments and Title 18 U.S.C. §

1951(a) – Interference with Commerce by Extortion (hereinafter, "**TARGET OFFENSES**").

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is a black iPhone 7 cellular phone with IMEI #359162074437018 (hereinafter, "**TARGET DEVICE**").  The **TARGET DEVICE** is currently located at HSI Harlingen, 1717 Zoy Street, Harlingen, TX 78552, in the Non-Drug Evidence Vault.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## <u>PROBABLE CAUSE</u>

8..      The following paragraphs are furnished to established probable cause in support of this warrant:

    a.   HSI Special Agents (Agents) along with other law enforcement agencies have been investigating MARTINEZ and other coconspirators for an extortion, revenue allocation, and price fixing scheme victimizing transmigrante businesses along the southwest border between the United States and Mexico near Los Indios, Texas, and for complex trade-based and traditional money laundering activities.

    b.   A transmigrante forwarding agency is a business that facilitates the movement of used commodities (goods) from the United States to Latin America (Central and

South America, Mexico and the islands of the Caribbean) for re-sale. Transmigrante agencies oftentimes work with their customers and complete required United States Customs and Border Protection paperwork in order to legally transfer the commodity from the United States to somewhere else.

c.   MARTINEZ conspired with others, both known and unknown to law enforcement, to commit the **TARGET OFFENSES**. Your Affiant has been informed by CI#2[1], who told Agents that a price-fixing agreement was made in 2011 between owners of transmigrante agencies, namely, Miguel CABALLERO, Sandra MEDINA, and Mireya MIRANDA.  Agents were provided a written price-fixing agreement dated June 15, 2011 and signed by the aforementioned individuals. CI#2 and witness one also told Agents in 2013 MARTINEZ assumed control of the transmigrante industry. MARTINEZ enforced the price-fixing agreement and began charging trasmigrante agencies and other industry participants a protection tax, referred to as "piso", of $40.00 per vehicle export. Special Agents interviewed CABALLERO on February 20, 2020.  During this interview, CABALLERO corroborated CI#2's statements that MARTINEZ assumed control of the transmigrante industry in 2013 and began charging transmigrante business owners a $40.00 per vehicle protection tax or "piso" to operate.  CABALLERO told Agents that he met with MARTINEZ directly on three or four separate occasions in late 2013 during which they discussed

---

1        CI#2 is a subject identified in this investigation to have knowledge of an extortion scheme directed by MARTINEZ.  Throughout the investigation, CI#2 has provided information that has led to the seizure of evidence and arrests leading agents to believe that the information CI#2 provides is credible and reliable.  CI#2 is not under an indictment or pending any criminal charges known to agents and does not have a known criminal history.  CI#2 has been offered an immigration benefit for providing information to HSI, has been identified as a potential victim of the alleged extortion scheme and has provided information to HSI for approximately three and a half years.

MARTINEZ assuming control of the transmigrante industry and MARTINEZ

charging the above described piso.  CABALLERO advised that in addition to

imposing the piso, MARTINEZ established what witnesses have referred to as

"The Pool" in 2013.  The Pool involves the collection of all revenue from the

participating transmigrante businesses and each business only receives an agreed

upon percentage of this revenue. Based on the investigation, Agents believe that

MARTINEZ and his coconspirators have profited millions of dollars from the

extortion fees (piso) since 2013.  During the course of the conspiracy, specifically

between on or about January 1, 2014 through on or about April 5, 2022,

transmigrante exports totaled approximately 675,000 exports resulting in the

payment of at least approximately $27,000,000 in extortion fees.  Coconspirators

have consistently held meetings to discuss The Pool operations.  Based on

information received from CI#2, the most recent meeting known to Your Affiant

was on November 14, 2022, when Miguel CABALLERO, Herlinda

GUERRERO-Arias, Sandra MEDINA and Mireya MIRANDA met in

Brownsville, Texas.  As part of the extortion, several acts of violence were

committed, including murders, against competitors or business owners that failed

to comply with the illegal directives of MARTINEZ and his coconspirators, as

will be further explained in paragraph i.

d.  Throughout this investigation, HSI Agents have interviewed witnesses, debriefed

sources of information, reviewed open-source material, executed numerous search

warrants, conducted border searches, monitored pole camera footage, installed

vehicle tracking devices and conducted database searches leading Your Affiant to

believe that MARTINEZ and his coconspirators have been and will continue to extort transmigrantes businesses, launder the illicit proceeds, and orchestrate price-fixing among those businesses.

e.  Based on the investigation, Your Affiant believes that MARTINEZ employed multiple coconspirators to facilitate the extortion and price-fixing schemes. MARTINEZ and his coconspirators demanded that transmigrante agencies operating in the South Texas area charge a fixed price for their forwarding services.  Then, as explained above, the practice known as The Pool is enforced in which all the revenue is collected, and participating businesses receive only an agreed upon percentage of this revenue.

f.  On April 8, 2019, Special Agents received authorization from the U.S. District

Court for the Southern District of Texas to search one (1) black Samsung Galaxy

Note 9 Model SM-N960U with IMEI 356568090312972 which was seized from

Marco MEDINA (hereinafter "MEDINA'S cellular phone").  During the search

of MEDINA's cellular phone, HSI Agents located WhatsApp chat threads

depicting Facebook advertisements of transmigrante agency prices. HSI Agents

also observed a WhatsApp chat thread between coconspirators that Your Affiant

believes discussed that coconspirators were angry because smaller transmigrante

agencies were charging less than the fixed prices.  Below are screen captures from

the WhatsApp chat thread, Medina Screen shot 1-3:

**Medina Screenshot 1:**



**Medina Screenshot 2:**          **Medina Screenshot 3:**

      

g.  Your Affiant believes Medina Screenshot 1 is Miguel CABALLERO listing the

fixed agreed upon prices for each type of transmigrant export.  Your Affiant

believes the following two screenshots, Medina Screenshot 2 and 3, consist of text

messages between Mireya MIRANDA and Sandra MEDINA in response to a

Facebook posting by another transmigrant business, Transmigrantes Linda and

Tabitha Forwarding LLC, depicting much lower prices than the fixed prices

charged by MARTINEZ and his coconspirators.  The text messages were

translated from the Spanish language to the English language by a native Spanish

speaking HSI analyst. As translated the chat chain in Medina Screenshots 2 and 3

reads as follows: MIRANDA says, "the groups do not appreciate anything.  They

already have a Bond.  I don't know what else they want.  It is never enough."

Sandra MEDINA responds, "they want a higher percentage.  From where?  The

more you give them, the more."

9

h.   Based on numerous witness statements, Your Affiant knows that transmigrantes businesses can only use Mexican customs brokers authorized by MARTINEZ and his coconspirators.  The investigation has revealed through multiple witness interviews and seized documentation that trasnmigrantes businesses are responsible for paying an illegal tax, "piso," for every export transaction conducted.  The investigation revealed many occurrences in which businesses that do not obey these demands face reprisals, ranging from the invalidation of exports at the Mexico Port of Entry (POE) to acts of intimidation and violence.

i.   The acts of violence included kidnapping, assaults, and murder. During one incident on March 7, 2019, two individuals involved in a transmigrante business that was not complying with the demands of MARTINEZ and his coconspirators, were shot in Mexico after crossing the U.S. border from the Los Indios, Texas POE. One of the individuals was killed and the other seriously wounded. In another act of violence in November 2019, three individuals associated with a non-compliant transmigrante business were shot and died from their wounds while conducting transmigrante business in Mexico.

j.   HSI Agents also obtained information that MARTINEZ and his coconspirators invested proceeds from the extortion scheme in the purchasing of diesel and the fuel tanker trucks to export the diesel from the U.S. into Mexico.  In addition to exporting diesel, HSI Agents received information that MARTINEZ and his coconspirators are charging an illegal tax to companies that export diesel to Mexico via fuel tankers.  This illegal tax allegedly ensures the fuel tanker trucks will not be confiscated in Mexico.

10

k.   The investigation revealed MARTINEZ to be the owner/controller of a Bank of
America account ending in 5300 (hereinafter, "Account xxxx5300").  HSI Agents
have conducted searches of the Texas Workforce Commission (TWC) database
which contained no employment information for MARTINEZ.  Your Affiant has
reviewed bank accounts associated with MARTINEZ.  Account xxxx5300, which
lists MARTINEZ's occupation as an owner of MARTINEZ OKRA, a business
that is not listed or incorporated in the state of Texas.  Furthermore, Your Affiant
has reviewed MARTINEZ's tax filings with the Internal Revenue Service (IRS)
which provided MARTINEZ's reported income and its source.  According to the
years reviewed which included tax years 2008-2017, MARTINEZ has only filed
tax returns for 2015 and 2016.  For those years, MARTINEZ reported that his
income was derived from 3M MARKETING GROUP, LLC, not MARTINEZ
OKRA. However, between June 16, 2017 and August 31, 2022, Account
xxxx5300 had deposits totaling $2,784,343.66. None of these deposits appear to
be from 3M MARKETING GROUP, LLC.  Account xxxx5300 bank statements
contained 23 deposits between June 16, 2017 and September 10, 2018 from two
different food companies: nine transactions from Superior Foods, Inc. and 14
transactions from Badafi Foods, LLC respectively.  The total amount of the 23
transactions with these two companies totaled approximately $459,798.47.  While
it appears that these companies are potentially paying for okra, MARTINEZ
OKRA is not registered as a corporation with the Texas Secretary of State and the
funds were all received in less than two years.  Moreover, the $459,798.47 is
approximately 17% of the total deposits to Account xxxx5300 between June 2017

11

and August 2022.  Lastly, between June 24, 2015 and January 24, 2018, the

account closing date, MARTINEZ's Bank of America savings account, ending in

8540, had deposits totaling $451,496.41, none of the deposits appear to be from

3M MARKETING GROUP, LLC.  Your Affiant believes that MARTINEZ has

obtained illicit proceeds from criminal activity, namely the **TARGET**

**OFFENSES**, and has laundered some of those proceeds through Account

xxxx5300.

l.   Your Affiant knows that MARTINEZ's coconspirators have been observed going

to residences utilized by MARTINEZ during daily business hours.  Additionally,

Your Affiant has observed chat threads from the seized cellular phones of

MARTINEZ's coconspirators which indicate MARTINEZ is at his home or his

other residence during business hours.  On May 21, 2020, U.S. District Court

Judge for the Southern District of Texas, Honorable Fernando Rodriguez, Jr.,

m.  granted HSI Special Agents a search warrant to obtain information from
MARTINEZ'S Apple iCloud account. Your Affiant observed from MARTINEZ's
iCloud account an image dated October 28, 2019, depicted an envelope with
writing on the envelope indicating it contained a transmigrante extortion payment
and an image dated November 26, 2019 depicting a chart of The Pool
transactions.

Below are the images from MARTINEZ'S iCloud account:

**October 28, 2019**



**November 26, 2019**



n.  Affiant believes the information above indicates MARTINEZ works primarily at home and as such, would most likely use a phone, such as the **TARGET DEVICE** to communicate with coconspirators and direct his criminal activities, that MARTINEZ's iCloud account was synched with the **TARGET DEVICE** at one point, and if given authorization to search the **TARGET DEVICE**, Agents will discover more evidence similar to the images referenced above.

o.  Agents have developed a confidential informant[2] (hereinafter "CI#1").   CI#1 stated that MARTINEZ is extorting transmigrante agencies located in Brownsville and San Benito, Texas.  CI#1 stated that MARTINEZ was given the Los Indios, Texas POE by members of the Gulf Cartel, likely directed by Osiel CARDENAS-Guillen, a former leader of the Gulf Cartel and father-in-law to MARTINEZ.  CI#1 stated that by maintaining control of this territory, MARTINEZ is able to influence Mexico-based importers and brokers required to conduct business in the transmigrante industry, influence the Mexican Military presence or lack of presence, and order violent acts against competitors.  CI#1 stated that an individual (hereinafter "E.O.") worked for Tranmitadora Vaco, identified as an import/export business located in Brownsville.  Part of E.O.'s duties with Tranmitadora Vaco was to assist in escorting export clients in Mexico. CI#1 provided evidence that E.O.'s company had stopped paying extortion fees to MARTINEZ on or about September 14, 2018.  CI#1 stated that a representative

---

2       CI#1 is a subject identified in this investigation to have knowledge of an extortion scheme directed by MARTINEZ. Much of CI#1's information has been corroborated leading federal agents to believe that the information is credible and reliable. CI#1 is not under an indictment or pending any criminal charges known to agents involved in this investigation and does not have a known criminal history. CI#1 has been offered an immigration benefit for providing information to HSI and has been identified as a potential victim of the alleged extortion scheme.

from Tranmitadora Vaco received threats and provided a screen shot of the threats
to Agents that preceded an attack on E.O. in Mexico while he/she was escorting
Tranmitadora Vaco clients.  CI#1 stated MARTINEZ is requiring businesses
operating in the transmigrante indsutrcty to pay a daily protection fee in order to
continue operating.  According to CI#1, the fee is determined based on the
number of vehicles imported into Mexico from the day prior and that
MARTINEZ has employed Marco MEDINA, Pedro CALVILLO-Hernandez
(hereinafter "CALVILLO"), and others to facilitate the transmigrante extortion
scheme.  CI#1 has knowledge of the aforementioned transmigrante business,
Tramitadora Vaco, and stated that, at that time, October 2018, approximately
$50,000.00 per week was paid to MARTINEZ and his coconspirators.

p. On or about December 22, 2018, HSI Agents encountered Marco MEDINA at the
Gateway International Bridge located in Brownsville, Texas.  MEDINA was
attempting to make entry into the United States and HSI Agents subsequently
conducted a border search and inspected MEDINA and his personal belongings.
During the inspection, HSI Agents located two cellular phones for which
MEDINA claimed ownership.  HSI Agents observed a contact saved in one of
MEDINA's cellular phones as "Carlos Mtz", with phone number (956) 551-3414,
the phone number identified in this investigation as being utilized by
MARTINEZ.  HSI Agents received subscriber and call detail records from
Verizon which revealed (956) 551-3414 was subscribed to MARTINEZ.
Additionally, HSI Agents observed the **TARGET DEVICE** has a Verizon SIM
card and is an older model iPhone.  HSI Agents also observed the locked

15

screensaver for the **TARGET DEVICE** displays an image of Victor

MARTINEZ, MARTINEZ's deceased twin brother.  Based on those

circumstances and information in the following paragraphs, your Affiant believes

MARTINEZ was the user of the **TARGET DEVICE** and that the **TARGET**

**DEVICE** was eventually replaced with a more up to date iPhone.  HSI Agents

photographed, and video recorded the WhatsApp chat thread between

MARTINEZ and MEDINA which were subsequently transcribed to the English

language.  After reviewing a WhatsApp conversation between MARTINEZ and

MEDINA, HSI Agents noticed that MEDINA oftentimes referred to MARTINEZ

as, "Chief" leading Your Affiant to believe that MARTINEZ holds a leadership

position in the conspiracy and MEDINA takes direction from and reports to

MARTINEZ, as stated by C1#1.

q.  HSI Agents read WhatsApp chats, an application predominantly used to

communicate between cell phones, in which both MEDINA and MARTINEZ

expressed frustration that certain individuals and/or businesses were not paying

into or complying with their criminal schemes.  For example, an August 3, 2018

WhatsApp message began with MARTINEZ asking MEDINA, "Tell me the

latest." MEDINA responded that things are "a mess" and that "fucking Consuelo

is making fools out of everyone . . . [because] she didn't want to pay on Friday."

MARTINEZ responded, "She didn't pay or what? Check it out, or else, we have

to give her an ass beating." MEDINA then said, "She is working on it," but that

MEDINA doesn't trust her. MEDINA responded "a liar [who] is just lying to

keep getting volume" and remarked that she "doesn't care about the [Pool], she

cares about the volume." Finally, MARTINEZ reiterated the consequences for failing to pay, "If she doesn't shape up by Monday, she needs to get her ass beat in every way. Let's see who can handle the most." And MEDINA agreed with MARTINEZ on those consequences, "Yes. Because now it is really getting out of control." Based on the investigation and other conversations between MEDINA and MARTINEZ, reviewed, Your Affiant believes the two are discussing extortion payments that companies have not paid to MARTINEZ and the consequences for failing to do so.  If granted authorization to search the **TARGET DEVICE**, Your Affiant believes HSI Agents will discover more text conversations of this nature that confirm the existence of the conspiracy.

r.   HSI Agents also reviewed conversations between MARTINEZ and MEDINA detailing the delivery of money to MARTINEZ that occurred between January 9, 2018 and June, 28, 2018.  Lastly, HSI Agents observed a chat thread between MEDINA and CALVILLO, identified as the main money collector for MARTINEZ's extortion and price-fixing schemes.  Based on the chat, these messages were exchanged between June 12, 2018 and December 22, 2018.  In this chat thread, HSI Agents observed spreadsheets detailing the export activity and revenue of transmigrante agencies and Mexican customs brokers that were transmitted via WhatsApp.  HSI Agents were familiar with these spreadsheets as they were similar to other allocation spreadsheets provided by multiple witnesses in the transmigrante industry to law enforcement.

s.   On November 9, 2022, MARTINEZ, MEDINA, CALVILLO, and others were indicted by a federal grand jury from the Southern District of Texas for violations

17

of the **TARGET OFFENSES in United States v. Martinez, et al, Case No. 4:22-cr-560**.

t.   Per CI#2, since 2018, CI#2 has attended meetings with other transmigrante business owners that are complicit in The Pool.  CI#2 has attended approximately 45 different meetings and conducted undercover recordings.  HSI Agents last received recordings of transmigrante business meetings from CI #2 in June 2022. Additionally, HSI Agents received information that transmigrante business owners Miguel CABALLERO-Aupart, Herlinda GUERRERO-Arias, Sandra Kay MEDINA, and Mireya MIRANDA were planning to meet with MEDINA in Brownsville, Texas on November 14, 2022.  On the at same day, HSI Agents arrested MEDINA as he attempted to make entry into the U.S. from Mexico at the Los Indios POE.  The information provided by CI #2 and further investigative activity indicated MARTINEZ's and his co-conspirator's criminal schemes targeting the transmigrante industry was ongoing.

u.   On November 15, 2022, HSI Agents arrested MARTINEZ in McAllen, Texas.

v.   On November 17, 2022, U.S. Magistrate Judge Honorable Dena Palermo from the Southern District of Texas authorized HSI Agents to search and seize evidence from 1011 Travis Street, Mission, Texas 78572, with court case number 4:22-mj-2689.  On November 18, 2022, HSI Agents executed the search warrant at 1011 Travis St.  During the search warrant, HSI Agents discovered the **TARGET DEVICE** on the person of Genesis Martinez, known to HSI Agents as MARTINEZ's daughter, as well as her personal cellular phone.  Agents asked Genesis Martinez about the **TARGET DEVICE** and she claimed ownership.

Due to the presence of another phone in Genesis Martinez' possession and how it appeared that Genesis Martinez's mother, Celia Marlene CARDENAS-Salinas, was telling Genesis Martinez not to say anything, Agents suspected Genesis Martinez was not being truthful.  A Spanish speaking HSI Agent advised CARDENAS-Salinas and Genesis Martinez that they need to be truthful and not interfere in the investigation.  Genesis Martinez then admitted to HSI Agents that the **TARGET DEVICE** belonged to MARTINEZ.

w.  HSI Agents observed the model number for the **TARGET DEVICE** as "A1660."  HSI Agents conducted research which revealed Apple iPhones with model numbers A1660 to associated with the Apple iPhone 7.  Further open-source research conducted by Agents revealed the Apple iPhone 7 was released in 2016, indicating to your Affiant that MARTINEZ acquired the **TARGET DEVICE** during the timeframe of the aforementioned criminal conspiracy.

9.  Based on the information above, Affiant believes that MARTINEZ is the owner and was the user of the **TARGET DEVICE**.  Affiant also believes that MARTINEZ has demonstrated a propensity to use cellular phones to coordinate his criminal activity. Affiant believes the **TARGET DEVICE** was used by MARTINEZ during the timespan of the conspiracy and as such is likely to contain historical evidence of his criminal activity.  In addition, your Affiant believes that authorization to search the **TARGET DEVICE** will aid in the identification and possible confirmation of known and unknown co-conspirators' roles and responsibilities.

10.  The **TARGET DEVICE** is currently in the lawful possession of HSI Harlingen, located at 1717 Zoy Street, Harlingen, Texas 78552.  The **TARGET DEVICE** came into HSI

19

Agent's possession in the following way:  On November 18, 2022, HSI Agents executed a search warrant on 1011 Travis St, a residence utilized by MARTINEZ and his family.  The **TARGET DEVICE** was discovered in the possession of Genesis Martinez, MARTINEZ's daughter, who admitted the **TARGET DEVICE** belonged to MARTINEZ.  HSI Agents seized the **TARGET DEVICE** and subsequently transported it to the HSI Harlingen office where the **TARGET DEVICE** remains at this time. The **TARGET DEVICE** is secured in a Non-Drug Evidence Vault. Therefore, I seek this warrant out of an abundance of caution to be certain that a search of the **TARGET DEVICE**, will comply with the Fourth Amendment and other applicable laws.

11.     In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of HSI Agents.

### TECHNICAL TERMS

12.     Based on my training and experience, I use the following technical terms to convey the following meanings:

 a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities.  These capabilities

include, but are not limited to: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and email; taking,

sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the

Internet.  Wireless telephones may also include global positioning system

("GPS") technology for determining the location of the device.

b.   Digital camera:  A digital camera is a device that records still and moving images

digitally.  Digital cameras use a variety of fixed and removable storage media to

store their recorded images.  Images can usually be retrieved by connecting the

camera to a computer or by connecting the removable storage medium to a

separate reader.  Removable storage media include various types of flash memory

cards or miniature hard drives.  Most digital cameras also include a screen for

viewing the stored images.  This storage media can contain any digital data,

including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store any

digital data, such as word processing documents, even if the device is not

designed to access such files.  Some portable media players can use removable

storage media.  Removable storage media include various types of flash memory

cards or miniature hard drives.  This removable storage media can also store any

21

digital data.  Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional

features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations

involved in such navigation.  The Global Positioning System (generally

abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each

satellite contains an extremely accurate clock.  Each satellite repeatedly transmits

by radio a mathematical representation of the current time, combined with a

special sequence of numbers.  These signals are sent by radio, using

specifications that are publicly available.  A GPS antenna on Earth can receive

those signals.  When a GPS antenna receives signals from at least four satellites,

a computer connected to that antenna can mathematically calculate the antenna's

latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive email.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

22

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet.  An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g.,

121.56.97.178).  Every computer attached to the Internet computer must be

assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination.  Most

Internet service providers control a range of IP addresses.  Some computers have

static—that is, long-term—IP addresses, while other computers have dynamic—

that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

13.     Based on my training, experience, and research, I know that the **TARGET

DEVICE** has capabilities that allow it to serve as a wireless telephone, digital camera, portable

media player, GPS navigation device, and PDA. In my training and experience, examining data

stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **TARGET DEVICE**.

## ELECTRONIC DEVICES AND STORAGE

14.     As described above and in Attachment A, this application seeks permission to search and seize things that the **TARGET DEVICE** might contain, in whatever form they are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the **TARGET DEVICE**.  This information can sometimes be recovered with forensics tools.

15.     Searching for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, HSI

intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

## **METHODOLOGY**

16.     Following the issuance of this warrant, I will collect and deliver the subject **TARGET DEVICE** to wireless telephone forensic examiners.  These examiners will attempt to power the **TARGET DEVICE**, identify whether it is protected by a personal identification number (PIN), determine or circumvent the PIN and retrieve data from the **TARGET DEVICE**. Unlike typical computers, many wireless telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the **TARGET DEVICE** or in memory cards inserted into the **TARGET DEVICE**.  Current technology provides some solutions for acquiring data stored in some wireless telephone models using forensic hardware and software.  The forensic examiner will determine whether any data associated with this **TARGET DEVICE** may be so acquired and, if so, such data will be acquired forensically, and the follow-on examination will be conducted using the forensic copy.  Even if some of the stored information on the **TARGET DEVICE** may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must examine the **TARGET DEVICE** manually and record the process and the results using digital photography.  This process is time and labor intensive and, depending upon the workload of the few wireless telephone forensic examiners available, may take weeks or longer.

## MANNER OF EXECUTION

17.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

18.     I submit that this affidavit supports probable cause for a warrant to search the **TARGET DEVICE** and seize the items described in Attachment B.

Respectfully submitted,

Garrett Corley
Special Agent
Homeland Security Investigations

Subscribed and sworn to me by telephone on May 31, 2023 and I find probable cause.

SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

 

The property to be searched is a black iPhone 7 cellular phone with IMEI #359162074437018, seized from Carlos Favian MARTINEZ-Perez, and hereinafter referred to as the **TARGET DEVICE**. The **TARGET DEVICE** is currently located at HSI Harlingen, 1717 Zoy Street, Harlingen, Texas 78552, Non-Drug Evidence Vault. This warrant authorizes the physical and forensic examination of the **TARGET DEVICE** for purposes of identifying the electronically stored information described in attachment B.

## ATTACHMENT B

All records on the **TARGET DEVICE** described in Attachment A that relate to violations of Title 15 United States Code (U.S.C.) § 1 (Conspiracy to fix prices and allocate the market), Title 15 U.S.C. § 2 (Conspiracy to Monopolize), Title 18 U.S.C. § 1956(a)(1) (Laundering of Monetary Instruments), Title 18 U.S.C. § 1956(h) (Conspiracy to Launder Monetary Instruments), and Title 18 U.S.C. 1951(a) (Interference with Commerce by Extortion), since January 1, 2014, through present, including:

1. The phone numbers and/or direct connect and/or names and identities, including electronic mail addresses, usernames and passwords assigned to the **TARGET DEVICE**;

2. Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities, including electronic mail addresses, usernames and passwords stored in the **TARGET DEVICE** and in any other electronic media attached to or found with the **TARGET DEVICE**, including but not limited to SIM cards and flash memory cards;

4. Phone numbers, direct connect numbers, electronic mail addresses, internet Protocol addresses, and other accounts dialed or accessed using the **TARGET DEVICE** or otherwise communicating with or accessing the **TARGET DEVICE**;

5. Any photographs, video files, text, or multimedia messages (SMS and MMS), call history or call logs, and contact information, including but not limited to phone numbers stored in the telephone contained within the items listed in Attachment A, including:

   a. list of contacts, customers, and related identifying information;

   b. amounts, as well as dates, places, and amounts of specific transactions;

   c. any information related to co-conspirators, known or unknown, including, but not limited to: names, addresses, phone numbers, or any other identifying information;

   d. all bank records, checks, credit card bills, account information, and other financial records;

   e. any information recording Carlos MARTINEZ-Perez and co-conspirators travel;

6. Any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above. All electronic communications, including those previously received or transmitted, or held in temporary, intermediate storage incident to transmission, documents, and materials, including those used to facilitate previously received, transmitted, or stored, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, whether stored on any of the electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises with the scope of this application.

   a. Such electronic data in the form of electronic records, applications, documents, and materials, including those used to facilitate communication.

   b. "Hidden," erased, compressed, password-protected, or encrypted files.

   c. Various file "directories" and the individual files they contain, recently deleted data, scanning storage area for deliberately hidden files.

7. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, which in addition to law enforcement officers and agents, may include attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.